**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,            )
                                     )
      Plaintiff,                   )
                                     )
v.                                   )          Case No. 25-cr-00424-JFH
                                     )
CLAYTON DWAYNE SWIFT,                )
                                     )
      Defendant.                   )

## REPORT AND RECOMMENDATION

Before the undersigned is Defendant's motion to suppress evidence gleaned from a search of his cell phone. The totality of the circumstances show that Defendant freely and intelligently consented to the original search. The undersigned, therefore, recommends denying Defendant's motion.

### I.    Standard of Review

A request to suppress evidence is properly presented by pretrial motion. *See* Fed. R. Crim. P. 12(b)(3)(C). When a motion is filed, the court holds a suppression hearing "to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the [Constitution]." *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). In deciding this preliminary question, "the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

"The defendant has the burden of showing the Fourth Amendment was implicated, while the government has the burden of proving its warrantless actions were justified." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (citations omitted). "Evidence seized pursuant to a warrantless search, once questioned, must be suppressed unless the search and seizure come within an exception to the Fourth Amendment

requirement of a warrant." *United States v. Sporleder*, 635 F.2d 809, 813 (10th Cir. 1980) (footnote omitted).  The Government's burden is proof by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *see also United States v. Johnson*, 43 F.4th 1100, 1110 (10th Cir. 2022) ("The government bears the burden of proof to justify warrantless searches and seizures by a preponderance of the evidence." (internal quotations omitted)).  "The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004).

"When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d).  The facts outlined below constitute the Magistrate Judge's findings necessary for the resolution of Defendant's motion, gleaned from testimony at the evidentiary hearing, as well as a review of the Government's Exhibits 1 and 2.[1]

## II.    Factual Findings

On the evening of September 5, 2025, Defendant Clayton Dwyane Swift ("Swift") was shot, allegedly by Trevor Pickett.  FBI Special Agent Audra Rees ("Rees") works cases of violent crime in Indian country, and she led the investigation into Pickett.  Rees testified that she usually tries to interview the victims of such crimes.  Following the shooting, Swift underwent multiple procedures and was hospitalized in an intensive care unit.  Around 1:30 or 2:00 a.m. on September 6th, Rees and another agent went to the hospital to interview Swift.  Rees found Swift to be "very comfortable" and apparently under the influence of some sort of medication.  Rees decided not to interview Swift due

---

[1] These hearing exhibits are the same as Exhibit 2 to Defendant's motion (Dkt. No. 38) and Exhibit 2 to the Government's response (Dkt. No. 39-2), respectively.

to his mental state, the time of day, and the fact that Swift had just been shot a few hours earlier.

Agent Rees also testified that, as part of her usual investigation, she tries to obtain evidence from various sources, including from cell phones. During the investigation, Swift's mother, Heather Swift ("Heather"), gave his two cell phones to Rees. Rees testified she wanted to search Swift's phones to look for communications between Swift and Pickett.

Because Agent Rees had Swift's phones (and could not contact him by text), she also coordinated with Heather to interview Swift after he got home from the hospital. They agreed that the agents would interview Swift on September 10, 2025, at the home he shares with his mother.

The record as to what Agent Rees knew or did before this interview is less clear. On September 8, 2025, Rees and a Cherokee Nation investigator interviewed Heather. During this interview or another interview, Swift's mother told Rees that Swift's estranged wife, Angel, had told Pickett that Swift was a danger. At some point in the investigation, Angel told Rees that she saw Swift looking at child pornography on his phone and that he deleted it; Rees does not know when her interview of Angel occurred. Rees believes that, on September 8, 2025, the Cherokee Nation investigator contacted the Dewey, Oklahoma, police department about their investigation into Swift. Rees believes the Dewey police department's investigation into Swift involved child sexual assault, but she does not remember when she learned this. At some point Rees called the Dewey police department investigator.

3

At a minimum, Rees knew by September 10th that there had been allegations that Swift has mistreated Pickett's dog, that he was a danger to Heather or Angel, and that he had committed child molestation.

On September 10th, Swift was walking on his own and opened the door to admit Agent Rees and Special Agent Ashleigh Siska ("Siska"). Swift, Rees, and Siska sat in the living room; no others were present. Rees and Siska wore plain clothes. The agents did not unholster their service firearms, did not threaten Swift, and did not touch Swift (except for a handshake). Rees recorded the substantive portion of her interview with Swift, which lasted around 40 minutes. Swift never asked for a break, never looked like he did not want to talk to Rees or Siska, and had no problems communicating. Rees found Swift to be alert, pleasant, and calm—but he looked physically uncomfortable. Rees does not recall asking Swift whether he was on any medication, but she saw no signs that Swift was confused, intoxicated, high on medication, or unable to focus. Rees saw no reason to believe Swift did not understand what was happening.

During the interview,[2] Rees asked Swift to tell them everything that happened the night of the shooting. Swift immediately began a long, detailed recitation of the events, pausing at one point to grunt perhaps from pain. After approximately six minutes, the agents began asking Swift questions, with Rees telling Swift that "'I don't know' is a perfectly fine answer." For the next eight or so minutes, Defendant continued to answer questions and describe the events, even drawing a diagram for the agents. His account was detailed, and he spoke clearly.

---

[2] The Court relies on hearing Exhibit 1 for the words spoken during the interview.

After Swift finished giving his account, the agents asked for and Swift provided his email address, social media usernames, and birthdate.  Rees told Swift that she had his two cell phones and that one of her goals was to search the phones for communications between Swift and Pickett.  Rees said there were a couple of ways she could go about searching the phones.  She said, "I can obtain -- I could apply for a search warrant or, if you're willing, if you signed a consent form, I could search them that way."  Rees told Swift that it was "completely up to you which way you'd like to do that."  Rees reiterated the point later, saying "[s]o if you are willing, we could consent search your phone.  And if you're not, this is America and that's your right."  Swift asked Rees if providing his consent would lead to his cell phones being returned sooner.  Rees said it could and that, typically, consent searches do work more quickly, although she warned that the workers who download the phones were backlogged.  Rees also told Swift that when people give their passcodes, it absolutely expedites the process.  Rees asked Swift what he thought about that, and he said that was pretty good.

Rees then pulled out the consent form, along with pictures of the phones.  Swift was able to identify the phones as his.  Rees told Swift, "So consent is only real consent if it -- if you can revoke it later.  So just know that if you decide like, nah, I think I want my phone, like I don't think I want them doing that, all you have to do is let me know and then we stop."  Rees told Swift that the form said that she was not forcing him at all and he was willing to let them search his phone.  Rees allowed Swift to read over the form.  Rees clarified that they would be searching the entire phone and, while they would be looking for things relevant to the investigation, "[p]ractically, the way this happens, is it downloads the entirety of each phone."  After Swift reviewed the form, Rees gave him a pen to sign and he signed.  Rees signed as a witness.  Swift provided the six-digit passcodes

needed to unlock the devices. Rees told Swift it could be a few days, weeks, or months before they would be done with the devices.

The consent form states that Swift gave permission, freely and voluntarily, for the FBI to search Swift's two phones and iPad "for any evidence of a crime or other violation of the law" and "to take any evidence discovered during this search . . . ."

After obtaining the consent, Rees asked Swift about some "rumors." The first was that Pickett was mad, because Swift had been mean to his dog. The other was that Swift could be a safety risk to his mother or Angel. Rees and Swift discussed the allegations and whether there was any reason for someone to think he was going to hurt someone that night. Swift raised that his sister would tell his mom that he was a threat. They also discussed that Swift and Pickett had never physically fought in the years they had known each other. The agents then returned to the night of the shooting and confirmed Swift's recollection of the events. The agents also asked whether Pickett had any devices they did not know about.

Rees does not remember whether she called a Dewey police officer on September 10th to say Rees had Swift's phones and consent to search, but she would not dispute it if the officer said she did. Rees recalls calling the Dewey police officer on September 11th and reminding them of their obligation to call the DHS hotline about the potential of alleged child abuse, which she believes was due to the molestation allegations.

After the FBI began searching Swift's phones, it found evidence of possession of child pornography. As soon as Rees found child pornography on Swift's phone, she asked a different agent to investigate that subject.

6

Currently, Rees believes that the motivation for the shooting relates to allegations about abuse of the dog, but this is still not clear.  Rees has not investigated whether the allegations of child molestation were a motive for Pickett's alleged shooting of Swift.

## III.    Analysis

### A.    Warrantless Searches & Consent—Generally

The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  "For this reason, a warrant is generally required before an officer may search or seize persons or property." *United States v. Warwick*, 928 F.3d 939, 943 (10th Cir. 2019).  However, this general rule is subject to "a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One such exception is consent of the person who owns or is in control of the article to be searched.  *Warwick*, 928 F.3d at 943.  For this exception to apply, the government must prove by a preponderance of the evidence that (1) the officers received either express or implied consent and (2) the consent was freely and voluntarily given.  *United States v. Guillen*, 995 F.3d 1095, 1103 (10th Cir. 2021).  "Consent is voluntary if it is unequivocal and specific, freely and intelligently given, and not the product of duress or coercion." *Id*. at 1104 (citing *Warwick*, 928 F.3d at 945).

"Whether a consent was voluntary or was the product of coercion or duress, express or implied, is to be determined by the totality of the circumstances." *United States v. Gay*, 774 F.2d 368, 376 (10th Cir. 1985).  Factors considered include physical mistreatment; use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone; the physical and mental condition and capacity of the defendant; the number of officers on the scene; the display of police weapons; and whether the officer

7

read the defendant his *Miranda* rights, obtained consent pursuant to a claim of lawful authority, or informed the defendant of his right to refuse consent. *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006).

### B.    Swift's Consent

Swift does not deny that he gave the agents express consent to search his phones. Instead, Swift argues his consent was not freely and voluntarily given. In his brief and at oral argument, Swift raises three bases for his argument: (1) his mental capacity, namely that he was on medication and in pain during the interview;[3] (2) trickery, that is the FBI concealed the real, or full, reasons for why it wanted to search his phone; and (3) inevitability,[4] based on the agent's statement that Swift could consent or the agents could apply for a search warrant. The undersigned will discuss each argument and then return, as the Court must, to the totality of the circumstances.

### 1.    Capacity

At the hearing, there was no evidence presented regarding Swift's medication or its impact on him, although there was evidence that Swift was in some discomfort during

---

[3] In his motion, Swift also argues his age and education. (Dkt. No. 37 at 6 (noting Swift was a 23-year-old high school graduate).) However, no evidence regarding these issues has been presented, and Swift's counsel did not pursue this argument at the hearing. In any event, the Supreme Court has held that, while these factors are not irrelevant, a 22-year-old with an 11th grade education "was plainly capable of a knowing consent" in the totality of the circumstances before it. *United States v. Mendenhall*, 446 U.S. 544, 558 (1980).

[4] Swift calls this "coercion." As discussed below, coercion involves more than the inevitability of a search and goes to the ultimate decision the Court must make based on the totality of the circumstances. So, the undersigned will use a different term for the specific argument made by Swift's counsel.

the interview.[5]  Even if Swift was on pain medication, there is no evidence that it affected him to such an extent that he could not freely and voluntarily consent.

Where drug intoxication is raised, the question is whether the defendant "was so intoxicated that his consent to search was not the product of a rational intellect and a free will," such that "the act of consent was [not] that of one who knew what he was doing." *Gay*, 774 F.2d at 376–77.  This does not mean that the mere fact a drug is ingested removes a defendant's capacity.  For example, in *Gay*, the defendant was obviously intoxicated—he "was staggering and swaying as he walked; his speech though understandable was slurred; [and] he appeared to the troopers to be in an unkept condition."  *Id.* at 376.  But, the defendant in *Gay* also was able to answer questions addressed to him, produce a driver's license and empty his pockets on request, and to choose to consent to one search but not another.  *Id.* at 377.  In these circumstances, the Tenth Circuit found no clear error in the trial court's finding that the defendant's consent was valid.  *Id.*

Here, there is no evidence that Swift was intoxicated at all, much less that such intoxication deprived him of his ability to know what he was doing.  Swift was able to walk to the door and welcome visitors; he gave lengthy, involved answers to questions; drew a diagram; and asked his own questions when deciding whether to consent to the search.  Agent Rees further testified—without contradiction—that she saw no signs that Swift was confused, intoxicated, high on medication, or unable to focus that day.  This evidence shows that Defendant understood the agent's questions and knew what he was doing

---

[5] At the hearing, Swift's counsel elicited testimony from Agent Rees that she is not aware of the medications Swift had been prescribed on the date of the interview, but she "would not dispute" it if counsel told her Swift was on oxycodone.

when giving consent to search his phone. Similarly, there is no evidence that Defendant's pain or discomfort affected his lucidity in any way. The undersigned does not find Swift's physical or mental capacity to have affected his ability to consent, under the totality of the circumstances discussed below. *See also United States v. Luna-Santana*, 128 F. App'x 42, 47–48 (10th Cir. 2005) ("Although it is evident from the record that [the defendant] had been drinking and may not have been completely lucid, the record also shows that he understood what the officers were asking of him and voluntarily consented to the search of his vehicle.");[6] *United States v. Romero*, 247 F. App'x 955, 964 (10th Cir. 2007) (district court did not clearly err in finding allegedly intoxicated defendant's consent voluntary where defendant understood and responded to questions; he offered a narrative explanation; and his actions and demeanor did not indicate he had been drinking); *United States v. Quezada-Lara*, 831 F. App'x 371, 376-78 (10th Cir. 2020) (noting the Tenth Circuit has never required perfect mental ability to find consent voluntary).

### 2.    Trickery

Swift next argues the agents tricked him by not revealing that they wanted to search his phone for more than just evidence of the shooting. As noted in the factual findings above, the evidence on this issue is less than clear. It is clear that Agent Rees wanted to search the phone for evidence of Swift's shooting and was, in fact, searching one of the phones for such evidence when the first child pornography was found. There is also evidence that Rees was aware of the separate child molestation investigation on September 10th and became aware, at some point, of the allegation that Swift once had child pornography on his phone. For sake of argument, the undersigned will assume that

---

[6] Unpublished decisions are not precedential, but they may be cited for their persuasive value. 10th Cir. R. 32.1(A).

Agent Rees wanted Swift's consent so that she could search for evidence of the shooting and evidence of Swift's alleged other crimes of child molestation or possession of child pornography.

The Tench Circuit has "repeatedly held that deception and trickery are among the factors that can render consent involuntary." *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011) (noting "[w]e should be especially cautious when this deception creates the impression that the defendant will be in physical danger if he or she refused to consent to the search"). "Not all deceit and trickery is improper, but when the police misrepresentation of purpose is so extreme that it deprives the individual of the ability to make a fair assessment of the need to surrender his privacy the consent should not be considered valid." *Id.* at 1280 (citation modified) (finding consent involuntary when defendant reasonably could have believed, based on the agents' statements, that there was a bomb in his apartment); *see also United States v. Woody*, 45 F.4th 1166, 1176 (10th Cir. 2022) ("But not all deceit and trickery is improper; the surrounding circumstances are significant to the analysis, and the operative question is whether deceit or trickery is used to imply an individual has no ability to refuse consent." (citation modified)).

Here, Agent Rees truthfully stated that she wanted to search Swift's phones for evidence related to his shooting. This is what she actually did after she obtained the consent. Even assuming she also wanted Swift's consent due to the allegations of crimes against children, the omission of the information did not render Swift's consent necessarily involuntary. *See* Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Am. § 8.2(n) (6th ed. 2025) (noting, "since *Schneckloth v. Bustamonte*, it cannot be said that such deception [as to the crime under investigation] is inherently incompatible with consent, for in *Schneckloth* the Court adopted the voluntariness test from the coerced

11

confession cases, which has not been deemed to compel the exclusion of statements obtained by police misrepresentation of the crime under investigation." (footnotes omitted)); *see also Woody*, 45 F.4th at 1176 (consent not rendered involuntary by agent's false statement that one instance of child sexual abuse was no big deal).  Moreover, Agent Rees explicitly warned Swift that—if he signed the consent form—agents would be searching the entire phone and that the entirety of the phone would be downloaded.  Any reasonable person would understand that the entire contents of the phone would be seen by agents, if such consent were given.  Any alleged trickery did not deprive Swift of the ability to make a fair assessment as to whether to consent.

The alleged and assumed trickery is considered as part of the totality of the circumstances below, but the Court finds that it did not deprive Swift of his ability to make a free and voluntary decision to consent.

### 3.    Inevitability

Swift finally argues that his consent was not voluntary, because he really had no choice.  Whether he consented or not, he argues, he believed his phones would be searched; consenting would just make that process go quicker.

The Tenth Circuit has made it clear that—"Even if [a defendant] felt that withholding consent would be futile . . ., that feeling would not necessarily vitiate his unequivocal, specific, free, and intelligently given consent under the totality of the circumstances." *Warwick*, 928 F.3d at 946.

Here, there is no evidence that Swift truly felt withholding consent would be futile or that his phone would be searched regardless of his decision.  Agent Rees correctly told Swift that she could apply for a warrant or she could search the phones with Swift's consent.  There was no certainty that a warrant would be granted.  It was Swift who raised

the issue of timing—asking if he could get his phones back sooner if he consented. Again, Rees correctly informed Swift that this was a possibility, especially if he provided his passcodes. Swift made no statements indicating a belief that his consent did not matter or that he had to consent. Instead, Swift asked questions and discussed his decision with the agents.

### 4.    The Totality of the Circumstances

In the end, however, the Court must return to the fundamental question at issue— whether Swift's "consent was the product of an 'essentially free and unconstrained choice by [the] maker' or whether it was the product of 'duress or coercion, express or implied.'" *Sawyer*, 441 F.3d at 895 (quoting *Schneckloth*, 412 U.S. at 225, 227). Looking at the totality of the circumstances, the undersigned finds it was free and unconstrained.

Only two agents interviewed Swift. *See, e.g., Warwick*, 928 F.3d at 945 (noting "only one or two agents were present when [the defendant] signed the consent form"). The agents were not in uniform and, while they had their service weapons, those weapons remained holstered. *See, e.g., United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998) (noting, although four armed officers were present, "none of the officers unholstered his firearm"). There were no other signs of force. *See, e.g., United States v. Guillen*, 995 F.3d at 1105 (noting the presence of multiple officers was a factor, but there was "no other evidence in the record suggests [the defendant] faced a display of force designed to overbear"). The agents were calm and even friendly in their discussion with Swift, expressing happiness at his survival. The agents made clear that they were looking for real consent and Swift could revoke his consent at any time. There was no violence, threats, promises or inducements (other than, perhaps, an implication of speed), or aggressive language or tone. *See, e.g., Sawyer*, 441 F.3d at 897 ("There is no evidence in

13

the record that the Kansas Officers . . . used physical touching, violence, threats, promises, inducements, deception, trickery or an aggressive tone, or that Defendant's physical or mental condition rendered him unable to consent knowingly and intelligently."). There was no claim by the agents that they could search the phone without Swift's consent—only a statement that they could apply for a search warrant to do such a search. *See id.* (noting consent pursuant to a claim of lawful authority would include a claim by the officers that they could search even without the defendant's consent). The agents did not read Swift his *Miranda* rights, but there was no need to, as he was not detained. *Cf. United States v. Dozal*, 173 F.3d 787, 796 (10th Cir. 1999) (finding consent may be voluntary even if the defendant is detained).

All that's left is as noted above. Swift was in some pain and may have been on pain killers. Agent Rees may have failed to mention an additional reason why she wanted to search the phones. These facts are overwhelmed by the other circumstances, all showing that Swift was capable of choice, was free to decide, and voluntarily made the decision to allow the agents to search the entirety of his phones. The search of Swift's phones did not violate his Fourth Amendment rights, and there is no basis on which to suppress the evidence arising from that search.

## IV.    Conclusion and Recommendation

The undersigned Magistrate Judge finds that Defendant freely and intelligently gave his consent for the investigators to search his phone. Accordingly, the undersigned Magistrate Judge **RECOMMENDS** that Defendant's *Motion to Suppress* (Dkt. No. 37) be **DENIED**.

In accordance with 28 U.S.C. § 636(b), a party may file specific written objections to this Report and Recommendation.  Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by April 3, 2026.

If specific written objections are timely filed,

> The district judge must consider de novo any objection to the magistrate judge's recommendation.  The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions.

Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1).  Failure to timely object waives a party's right to appellate review.  *Goebel*, 959 F.3d at 1265–66.

**SUBMITTED** this 20th day of March, 2026.

_____
SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT